# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RITA MERCADO,<br>    Plaintiff,<br><br>v.<br><br>SUGARHOUSE HSP GAMING, L.P., SUGARHOUSE HSP GAMING, L.P. DBA SUGARHOSUE CASINO, SUGARHOUSE HSP GAMING PROP. GP, L.L.C., DOMINICK MONTANARO, JAY TARBELL,<br>    Defendants. | CIVIL ACTION<br><br><br><br>NO. 18-3641 |

## MEMORANDUM OPINION

This suit centers on a casino employee's allegations of workplace pregnancy discrimination. Plaintiff Rita Mercado brings this suit against her former employers Sugar House HSP Gaming, L.P., Sugarhouse HSP Gaming, L.P. doing business as Sugarhouse Casino, and Sugarhouse HSP Gaming Prop. GP, L.L.C. (collectively, "Sugarhouse"), Sugarhouse's Director of Human Resources, Jay Tarbell, and another Sugarhouse employee, Dominick Montanaro. She principally brings claims of hostile work environment and constructive termination, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.*, and the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code §§ 9-1101 *et seq*. Defendants now move for summary judgment. For the reasons that follow, the motion shall be granted in part and denied in part.

  I.  **BACKGROUND**

    A. **Facts**[1]

Sugarhouse operates a casino in Philadelphia. The casino itself has both smoking and

---
[1] The facts given are undisputed unless otherwise noted.

nonsmoking sections. Sugarhouse uses an electronic management system, Virtual Roster, to assign employees to specific parts of the casino. Once Virtual Roster assigns a location, changes must be made manually by management. Casino employees are organized in a hierarchy: table games dealers are at the lowest rung and report to floor supervisors; floor supervisors report to pit managers; pit managers report to a shift manager.

To accommodate nursing mothers, the casino also has a private lactation room, known as the "Pump Room." The Pump Room is locked, and a key is held by Sugarhouse security employees. While dealers are generally afforded one twenty-minute break for each eighty minutes they work, nursing mothers are permitted two additional twenty-minute breaks per shift, which they may "stack" with other breaks to allow up to forty minutes of break time to pump. Sugarhouse maintains an anti-harassment policy.

Plaintiff began working for Sugarhouse in June of 2013. At the time relevant to the events underlying this suit, she was working as a dealer. In May of 2016, Plaintiff became pregnant with her first child. Plaintiff testified that she began to encounter difficulty at work once she requested that she be assigned to nonsmoking areas of the casino. If she had been assigned by Virtual Roster to a smoking area of the casino, she would ask the pit manager on duty to move her to a nonsmoking area. According to Plaintiff, whenever she made such a request, she was told that she would have to begin work at the assigned table in the smoking section while management attempted to find a new placement. "Sometimes, eventually," her request to move to a nonsmoking section was accommodated, while other times it was not. Defendants, for their part, dispute this characterization of Plaintiff's assignments while pregnant, and assert that all of Plaintiff's requests to move to nonsmoking sections were accommodated.

Plaintiff also testified that during her pregnancy, a particular pit manager, Berneia

2

'Bernie' Taylor, frequently told Plaintiff that her requests to work in nonsmoking areas were "an inconvenience." Plaintiff reported Taylor's comments to shift manager Robin Ryan, who said she would speak to Taylor. Nonetheless, according to Plaintiff, Taylor subsequently repeated her comment that Plaintiff's requests were an inconvenience. Defendants dispute both that Taylor made these comments, and that Plaintiff reported them to Ryan.

Plaintiff began a leave of absence in connection with her pregnancy in January of 2017; gave birth on January 31, 2017; and returned to work on March 22, 2017.

Upon her return, Plaintiff informed her colleagues that she would be breastfeeding her child and regularly using the Pump Room during breaks. According to Plaintiff, she soon began to experience issues with both management and other staff members related to her pumping. For example, on one occasion, Plaintiff asked Defendant Dominick Montanaro, a pit manager, to take a pump break. Montanaro responded by asking how big Plaintiff's breasts would get if someone refused to let her pump. On another occasion, a different pit manager told Plaintiff that she was "beautiful, if only [she] could stop pumping." Another pit manager commented to Plaintiff "isn't that boy done eating by now?" Others commented to Plaintiff that she was pumping too much, and that her son "should be on formula by now." Defendants accept that Plaintiff testified to these statements, and do not specifically refute that these events took place.

Plaintiff further testified that she reported these incidents to Ryan on at least three separate occasions. At one point, Ryan told Plaintiff that she should "watch [her] back" because several employees had approached Ryan and complained that Plaintiff was taking advantage of her breaks and was not actually pumping. Ryan suggested to Plaintiff that she exit the Pump Room holding a bottle of milk or some other object to show that she was in fact pumping. Ryan did not report any of these conversations to Human Resources. Defendants dispute some of the

contents of what was said in these conversations, but generally accept that they occurred and that Ryan did not report them to Human Resources.

On September 1, 2017, Plaintiff was exiting the Pump Room holding a bottle of milk. Another dealer, Lauren Roche, happened to be nearby and commented to Plaintiff, "[i]s that all the milk you pumped? You look like you're drying out." Plaintiff responded that she had more milk in her bag. Roche then replied, "[w]ell I just want you to know you are jacking up everyone's schedule." Roche then continued talking to others in the vicinity, saying that Plaintiff's breaks were unfair to others. The next day, Plaintiff reported Roche's comment to Ryan. Ryan asked Plaintiff to fill out a form, documenting the incident, and said that Sugarhouse would investigate. Plaintiff also reported the incident to Defendant Jay Tarbell, the Director of Human Resources. Plaintiff told Tarbell that she felt that other employees thought that she was taking advantage of her pump breaks. Tarbell asked Plaintiff if she was in fact taking advantage of the pump break policy, and she responded she was not. Tarbell then told her "I guess [you] have nothing to worry about." Defendants do not dispute these events.

Plaintiff also testified that either Tarbell or Ryan informed her that the employees in charge of surveillance had reviewed footage of the incident with Roche, and had "seen nothing." However, Plaintiff herself spoke to those employees, and was told that in fact they had seen the incident on the surveillance footage. Plaintiff then raised this with management, and testified that management "suddenly found people to ask" once she brought it up. Defendants, for their part, contend that Ryan requested and reviewed the footage, and that Sugarhouse conducted a full investigation into the incident. Documentation from Sugarhouse reflects that Roche was asked about the incident and denied it occurred, but that others present recalled Roche making the comments. Roche was initially issued a "Written Warning Level 2" for the incident, which

was later scaled back to verbal feedback.

Plaintiff stopped working for Sugarhouse two weeks later, following another incident with a coworker related to the Pump Room. In the time immediately after giving birth and returning to work, Plaintiff would sign out the Pump Room key from security and return it on each occasion that she used the room, which occurred multiple times per day. At some point, however, Plaintiff testified that she was told by a security officer that she was the only person using the key and that she should just keep the key for her full shift and return it at the end of the day, rather than sign it out each time, and that she began doing so. The sign out sheet for the key shows that between May and August of 2017, Plaintiff was the only person signing out the key.

On September 14, 2017, Plaintiff went to retrieve the key from security, and security officer Tequila Phillips was on duty. Plaintiff testified that Phillips started yelling at her and physically approached her, and refused to give her the key, saying that Plaintiff never returned it. Defendants do not dispute that an incident with Phillips occurred, though they note that Phillips reported that she did not refuse to give Plaintiff the key, and that she simply told Plaintiff to bring the key back when she was done pumping instead of keeping it for her full shift.

After the incident, Plaintiff went to Phillips's supervisor, Charles Skorski, and reported that Phillips refused to provide the key. Skorski told Plaintiff that Phillips was "just high strung" and said that whenever Plaintiff needed the key, she should call him and he would obtain the key for her. Plaintiff then reported this incident to Ryan, who acknowledged that Phillips had not handled the situation properly. Plaintiff then left early, and Ryan accounted for Plaintiff's early departure in a manner than ensured that Plaintiff would not receive any adverse attendance consequences. Defendants do not dispute that these conversations took place, though they refute that the contents of the conversations were precisely as Plaintiff described.

5

The next day, September 15, 2017, Plaintiff called out from work in the morning. Later that afternoon, she called again and resigned her position.

### B. Procedural History

Plaintiff filed a charge with the EEOC, and subsequently received a right to sue letter. She commenced this action on August 24, 2018, bringing claims under Title VII. On November 7, 2018, Plaintiff filed an amended complaint, and brought the following claims: (I) Sex Discrimination in violation of Title VII against Sugarhouse only; (II) Retaliation in violation of Title VII against Sugarhouse only; (III) Sex and Pregnancy Discrimination in violation of the PHRA against Sugarhouse only; (IV) Retaliation in violation of the PHRA; (V) Aiding and Abetting Discrimination in violation of the PHRA; (VI) Sex and Pregnancy Discrimination in violation of the PFPO; (VII) Retaliation in violation of the PFPO; (VIII) Aiding and Abetting Discrimination in violation of the PFPO. With regard to the discrimination claims, Counts I, III, and VI, Plaintiff does not specify a theory in the claims section of the Amended Complaint, but the general allegations nonetheless Plaintiff invoke several theories of liability: namely, hostile work environment, constructive termination, and failure to promote.

Following discovery, Defendants filed the instant motion for summary judgment on all claims.

## II.    LEGAL STANDARDS

Summary judgment is appropriate when the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court

must "view the facts and draw inferences in the light most favorable to the nonmoving party." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010).

**III. DISCUSSION**

Defendants moved for summary judgment as to all claims. Plaintiff does not oppose as to the retaliation and aiding and abetting claims, Counts II, IV, V, VII, and VIII. As to the remaining discrimination claims, Counts I, III, and VI, Plaintiff does not oppose summary judgment insofar as those claims rely on a theory of failure to promote. Accordingly, summary judgment as to those claims shall be granted as unopposed.

As a result, the dispute here is whether summary judgment in favor of Defendants is appropriate as to Plaintiff's discrimination claims, Counts I (Title VII), III (PHRA), and VI (PFPO), on theories of hostile work environment and constructive termination. Each theory is analyzed in turn.[2]

**A. Hostile Work Environment**

A plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). "To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted). "The first four elements establish a hostile work

---

[2] Though Plaintiff brings claims pursuant to Title VII, the PHRA, and the PFPO, the three laws are interpreted coextensively. *See Ives v. NHS Human Servs., Inc.*, 2016 WL 4039644, at *2 (E.D. Pa. July 28, 2016); *Jones v. Children's Hosp. of Phila.*, 2019 WL 2640060, at *5 (E.D. Pa. June 27, 2019); *see also Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims.").

7

environment, and the fifth element determines employer liability." *Id.* [3]

As to the first element—intentional discrimination because of her sex—the Pregnancy Discrimination Act ("PDA") amended Title VII to provide that "the terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). While the Third Circuit has not expressly resolved whether "a complaint based [solely] on the need to express breast milk is cognizable under Title VII," *Page v. Trustees of Univ. of Pennsylvania*, 222 F. App'x 144, 145 (3d Cir. 2007), other courts have so held, *see, e.g.*, *E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013); *Hicks v. City of Tuscaloosa, Alabama*, 870 F.3d 1253, 1259 (11th Cir. 2017). As these cases explain, "lactation is a normal aspect of female physiology that is initiated by pregnancy and concludes sometime thereafter," and thus is a "medical condition[]" "related" to pregnancy within the meaning of the PDA. *Houston Funding*, 717 F.3d at 429. Further, "[t]he PDA would be rendered a nullity if women were protected during a pregnancy but then could be readily terminated for breastfeeding." *Hicks*, 870 F.3d at 1260. Accordingly, here, Plaintiff has provided sufficient evidence of intentional discrimination because her sex by attesting that she was subject to assorted discriminatory treatment regarding her pregnancy and subsequent need to pump breast milk.

Defendants' argument to the contrary—that "[m]ost of the alleged discrimination was not

---

[3] There is some complexity as to whether Plaintiff maintains a PFPO discrimination claim against the individual defendants, Montanaro and Tarbell. In the Amended Complaint, Plaintiff specifically states that her Title VII and PHRA discrimination claims are asserted only against Sugarhouse, and not the individual defendants. But Plaintiff does not similarly limit her PFPO claim—instead, that claim is simply asserted against "Defendants." There is no obvious bar to Plaintiff's PFPO claim against the individual defendants: the PFPO "impose[s] individual liability on any person who aids, abets, incites, compels or coerces, or directly or indirectly commits unlawful discrimination." *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 671 (E.D. Pa. 2016). In their motion, in addition to highlighting purported evidentiary infirmities, Defendants moved for summary judgment in favor of the individual defendants as to the "aiding and abetting claims," and "the claims asserting they are individually liable," without specific reference to the PFPO discrimination claim. In response, Plaintiff explicitly abandoned the aiding and abetting claims, and analyzed only the discrimination claims as applied to Sugarhouse. In light of the fact that Plaintiff does not defend any claim as against the individual defendants, the Court understands Plaintiff to have abandoned all claims—including any PFPO discrimination claim—against the individual defendants.

because of Mercado's sex"—is off-target. Defendants assert that Plaintiff, by requesting nonsmoking assignments while pregnant, affirmatively sought to be treated differently based on her sex, and thus cannot claim that any failure to place her in a nonsmoking section was sex-based discrimination. This argument mischaracterizes both the law and Plaintiff's claim. As the Supreme Court has recognized, in certain circumstances, an employer's denial of a pregnancy-related accommodation may indeed constitute sex-based discrimination in violation of Title VII and the PDA. *See Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015). In any event, here, Plaintiff's claim is not that Defendants failed to provide sufficient *accommodation* for her request to be placed in a nonsmoking area while pregnant; it is instead that the *treatment* (comments and the like) related to this issue was part of a pattern of antagonism towards her pregnancy and subsequent pumping. Defendants also assert in summary fashion that many comments—such as the repeated statements that Plaintiff's requests to move from the smoking section while pregnant were "inconvenient"—were unrelated to Plaintiff's sex. But, at this stage, the facts must be viewed in the light most favorable to Plaintiff, and a reasonable jury could find that the comments were the product of hostility towards Plaintiff's pregnancy. *See Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006) ("[M]otivation behind [allegedly discriminatory] conduct is a question best left to the jury to decide."). Thus Plaintiff has made a sufficient showing to satisfy the first prong.

The second factor—discrimination that was severe or pervasive—"requires conduct that is sufficient to alter the conditions of the employee's employment and create an abusive working environment." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 (3d Cir. 2017) (internal punctuation omitted). The Third Circuit has recently reiterated that "'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to

9

contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). In either case, courts "must consider the totality of the circumstances, rather than parse out the individual incidents," *Mandel*, 706 F.3d at 168, and look to factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). However, "simple teasing, offhand comments, and [most] isolated incidents" are insufficient. *Faragher*, 524 U.S. at 788.

Here, too, Plaintiff has made an adequate showing to preclude summary judgment. She attested that, during the months she was pregnant and immediately following her return to work, she was subject to frequent, derisive commentary regarding her pregnancy and subsequent breast milk pumping. The cited interactions ranged from irritation at Plaintiff's condition to patent humiliation. For example, Plaintiff's alleged interaction with Defendant Montanaro—where she asked him to take a pump break, and he responded by asking how large Plaintiff's breasts would get if she were not allowed to pump—is plainly "humiliating," as it suggests that his response could be determined by the size of Plaintiff's breasts, or that he considered rejecting Plaintiff's request in order to observe the effect on her breasts. *Harris*, 510 U.S. at 23. In a similar vein, Plaintiff testified that she was subject to a string of commentary about how much milk she was producing, including comments that she was "drying out." Further, Plaintiff stated that her final encounter with security employee Phillips was "physically threatening." *Id.* Finally, given the difficulty Plaintiff experienced in obtaining daily table assignments and accessing the Pump Room, which she attested to using multiple times a day, the record, taken in the light most

favorable to Plaintiff, indicates that the environment may have "interfered with [her] work performance." *Id.* Thus Plaintiff has raised a triable question as to whether the treatment was severe or pervasive.

In arguing to the contrary, Defendants divvy up the alleged treatment into various categories (terming them, for example, "the Offhanded Remarks," and "the Roche and Phillips Incidents") and attack each as neither severe nor pervasive enough to withstand summary judgment. Yet courts "must consider the totality of the circumstances, rather than parse out the individual incidents." *Mandel*, 706 F.3d at 168. Defendants also point to Plaintiff's testimony that certain incidents made her feel "uncomfortable" or "unsafe," and assert that more is required. This effort is misguided: the question is whether, taken in the light most favorable to Plaintiff, her testimony raises a triable issue of fact as to severity or pervasiveness—not whether Plaintiff used those precise words in her deposition. Thus Plaintiff has adequately made out this element of her claim.

As to the third factor—that the discrimination detrimentally affected the plaintiff—this "inherently subjective question" often "presents difficult problems of proof and turns on credibility determinations." *Id.* at 169. Here, Plaintiff's testimony that the commentary made her feel both unwelcome and unsafe suffice. *See id.* (prong satisfied where "[a] jury could reasonably conclude that [the plaintiff] did not invite these comments or conduct and . . . was offended by them").

The fourth factor—that the discrimination would detrimentally affect a reasonable person in like circumstances—"is an objective standard and it is here that the finder of fact must actually determine whether the work environment is . . . hostile." *Lai v. Radnor Twp. Police Dep't*, 2016 WL 3762739, at *7 (E.D. Pa. July 12, 2016) (internal quotation marks omitted). In light of the

continuous commentary relating to Plaintiff's pregnancy, breasts, and need to pump, Plaintiff has raised a triable question that "[a] reasonable person would . . . also find such an environment objectively hostile or abusive." *Moody*, 870 F.3d at 215; *see also Bryant v. Wilkes-Barre Hosp., Co.*, LLC, 146 F. Supp.3d 628, 648 (M.D. Pa. 2015) (holding that "repeated comments and continual mocking by [the plaintiff's] co-workers . . . would have detrimentally affected a reasonable person in like circumstances"). Accordingly, Plaintiff has satisfied this prong.

Finally, as to the fifth factor—the existence of *respondeat superior* liability—"[t]he basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). The Supreme Court has summarized the liability standards for co-worker and supervisor harassment:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense [known as the *Faragher-Ellerth* defense], that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Here, Plaintiff has asserted that harassment stemmed from supervisors and co-workers alike. However, the parties do not parse whether the co-worker or supervisory liability standard should apply. Though Defendants passingly contest whether certain of the harassing employees may be properly deemed supervisors, they primarily contend that, even assuming the harassment was perpetrated by supervisors, they have established the *Faragher-Ellerth* defense as a matter of law.[4] Thus the analysis centers there.

---

[4] In reply, Defendants change tacks, and assert that the *Faragher-Ellerth* defense applies to claims of harassment by both co-workers and supervisors. This is incorrect. The defense applies only to claims of harassment by

The employer bears the burden of establishing the *Faragher-Ellerth* affirmative defense by a preponderance of the evidence. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). The defense "is available only where the plaintiff did not experience a tangible employment action." *Moody*, 870 F.3d at 219 (internal quotation marks omitted). "A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 216 (internal quotation marks omitted). Constructive discharge ranks as a "tangible employment action" only "when a supervisor's official act precipitates the constructive discharge." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004). Defendants assert that no tangible employment action was taken; Plaintiff notes that constructive discharge may constitute a tangible employment action, but primarily asserts that Defendants cannot establish the remainder of the *Faragher-Ellerth* defense. Accordingly, the Court assumes without deciding that Plaintiff has not suffered a tangible employment action.

Pursuant to the defense, "if no tangible employment action is taken, the employer may escape liability by establishing . . . that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424. "The cornerstone of this analysis is reasonableness: the reasonableness of the employer's preventative and corrective measures, and the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid further harm." *Minarsky v. Susquehanna Cty.*, 895 F.3d

---

supervisors. *See Vance v. Ball State Univ.*, 570 U.S. 421, 428-29 (2013); *see also Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866 (7th Cir. 2013) ("An employer is strictly liable if a supervisor harasses the employee and the employer cannot establish the affirmative defense recognized in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); when a co-worker harasses an employee, the employer is liable only if the employer is negligent in discovering or remedying the harassment.").

303, 311 (3d Cir. 2018).

As to the first element, "the existence of a functioning anti-harassment policy could prove the employer's exercise of reasonable care," *id.*, but does not per se establish the employer's reasonableness—the policy must be weighed alongside other evidence in the record, *see id.* at 312-13 (finding jury question where employer had anti-harassment policy in place, but harassment persisted). Here, it is undisputed that Sugarhouse maintains an anti-harassment policy. However, Plaintiff has provide ample indication that the policy was either ineffective or simply not followed: Plaintiff asserts that she notified Ryan, the shift manager (the highest-ranking manager during Plaintiff's shift), of the harassment on multiple occasions, yet Ryan did not report the harassment to Human Resources until after the incident with Roche. Further, Tarbell, the Director of Human Resources, testified that, after receiving such a report, the supervisor should notify Human Resources. In addition, Sugarhouse's handling of the incident where Roche told Plaintiff she was "drying out" and "jacking up everyone's schedule" raises questions, since Plaintiff testified that she was initially told there was no video of the event, Roche received only verbal discipline, and Plaintiff continued to experience issues (chiefly, the Phillips incident) afterwards. Accordingly, Plaintiff has presented sufficient indication that Sugarhouse's failed to "exercise[] reasonable care to prevent and correct any harassing behavior" to preclude summary judgment. *Vance*, 570 U.S. at 424.

As to the second element, Plaintiff has adequately demonstrated that she "t[ook] advantage of the preventive or corrective opportunities that the employer provided," by repeatedly flagging the issue to management. *Vance*, 570 U.S. at 424. Here, the parties agree that, within the span of March to September of 2017, Plaintiff reported the harassment on multiple occasions to Ryan, and ultimately to Tarbell as well. Thus, on this prong as well,

14

Plaintiff's claim is sufficient to withstand summary judgment.

As a result, for these reasons given, Plaintiff has adequately made out her hostile work environment claim, and Defendants have not demonstrated on this summary judgment motion that they are entitled to the *Faragher-Ellerth* defense as a matter of law. As a result, summary judgment in favor of Defendants shall be denied as to this claim.

## B. Constructive Discharge

"To establish a constructive discharge, [a plaintiff] must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Mandel*, 706 F.3d at 169 (internal quotation marks omitted); *see also Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016). This analysis is "an objective test and thus an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel*, 706 F.3d at 169. "In determining whether an employee was forced to resign, we consider a number of factors, including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations. *Id.* at 169-70. "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.* at 170; *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-48 (2004).

In support of their argument that Plaintiff was not constructively discharged, Defendants briefly advance two arguments. First, they argue that, in an appeal of a denial of unemployment benefits, Plaintiff stated that she quit because she was not given enough time to pump. However, Plaintiff stated elsewhere that the harassment precipitated her departure—including in her

15

unemployment application, where she cited the incident with Phillips as her immediate impetus for quitting. Accordingly, reading the record in the light most favorable to Plaintiff, and in consideration of the "objective test" applicable to a constructive discharge case, where "an employee's subjective perceptions of unfairness or harshness do not govern," Plaintiff's statement in her unemployment appeal is not fatal to her claim. *Mandel*, 706 F.3d at 169.

Second, Defendants argue that Plaintiff has not adequately made out her hostile work environment claim, and thus her constructive discharge claim necessarily fails. But, as explained above, Plaintiff has adequately made out her hostile work environment claim, and thus her constructive termination claim does not necessarily fail.

Accordingly, Defendants have not "demonstrate[d] that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law'" with regard to the constructive discharge claim. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 533 (3d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).

## IV. CONCLUSION

Accordingly, for the reasons given, Defendants' motion for summary judgment shall be granted as unopposed with regard to Counts II, IV, V, VII, and VIII, and with regard to Counts I, III, and VI on a failure to promote theory and as against the individual defendants. The motion shall be denied with regard to Counts I, III, and VI on theories of hostile work environment and constructive termination as against Sugarhouse.

An appropriate order follows.

**July 23, 2019**                                **BY THE COURT:**

                                                             **/s/Wendy Beetlestone, J.**

                                                             _____

                                                             **WENDY BEETLESTONE, J.**